UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In the Matter of the Arbitration between William Farley, | ) ) ) | CASE NO. 1:16 CV 690 |
| Petitioner, | ) ) | JUDGE PATRICIA A. GAUGHAN |
| and | ) ) ) | |
| Eaton Corporation, Respondent. | ) ) ) | **Memorandum of Opinion and Order** |

**Introduction**

This matter is before the Court upon petitioner's Motion to Vacate Arbitration Award (Doc. 7) and respondent's Motion for Confirmation of Arbitration Award and Entry of Final Judgment Thereon (Doc. 11). For the following reasons, petitioner's motion is DENIED and respondent's motion is GRANTED.

**Facts**

Petitioner William Farley (hereafter, petitioner or Farley) filed this Complaint and Motion to Vacate Arbitration Award Pursuant to 9 U.S.C. § 10 against respondent Eaton Incorporated (hereafter, respondent or Eaton). Petitioner moves to vacate the Interim and

1

Final Awards issued in the Arbitration between petitioner and respondent relating to a dispute arising under a contract, the Amended and Restated Payment Procedures Agreement of October 30, 1998 (the PPA) between the parties.  Respondent has filed a Motion for Confirmation of those awards.

The Court will summarize the underlying facts set forth by the Arbitrator which are generally undisputed. Eaton acquired property in 1986 containing a manufacturing facility located in Bethel, Connecticut. The property was formerly owned by Consolidated Controls Corporation (CCC), a subsidiary of Condec Corporation (later known as VBQ), in which Farley held a controlling interest.  The property contained a lagoon where untreated waste solvents had been deposited for years.  In their 1986 Asset Purchase and Sale Agreement (APSA), the parties included a provision whereby the seller would indemnify Eaton for the costs of addressing the environmental contamination following the sale.  In 1987, the Connecticut Department of Environment Protection (DEP) issued a clean-up order and Eaton began negotiating an appropriate clean-up remedy.  Ultimately, a pump and treat system was agreed upon and became operational in 1992. As early as 1991, Eaton began submitting requests for reimbursement to Farley's companies pursuant to the 1986 APSA. From that time and through 2003, Farley or the companies he controlled paid Eaton over $2 million in 13 separate payments.  Farley assumed personal liability for the indemnification obligations pursuant to the 1998 PPA, the contract upon which the Arbitration arose.

The PPA provides in relevant part:

Eaton has the right to make claims... under this Agreement if: Eaton has incurred or suffered losses, liabilities, damages, costs, or expenses (collectively 'Environmental Liabilities') equal to the amount of the claim resulting from (1) the environmental matters described on Exhibit A hereto.... (Doc. 7 Ex. 1, § 1.1, 1.1.1)

2

Exhibit A states in relevant part:

> Liabilities, obligations, fines, clean-up costs or penalties, with respect to the premises and matters set forth below, resulting from non-compliance prior to August 8, 1986 by CCC or VBQ, with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986:
>
> Bethel Connecticut Plant: on-site and off-site soil and groundwater contamination resulting from the use of on-site pits to treat and dispose of waste solvent. (*Id.* Ex. A)

Respondent explains how the current dispute arose. On November 19, 2010, Eaton certified, pursuant to § 1.1.3 of the PPA, that it was "Entitled to Receive Payment" from Farley for Facility environmental costs, including costs for the pump and treat groundwater remediation system, incurred from 2003 through 2010 in the amount of $506,460.93 (the 2010 Claim). Farley failed to make payment of the 2010 Claim and did not timely invoke dispute resolution in accordance with the PPA.  Eaton later submitted the claim, as authorized under the PPA, to the insurance company AIG which policy Farley had caused to issue to insure his obligations under the agreements with Eaton.  AIG then made two reimbursements to Eaton in the approximate amounts of $440,000 and $53,000. On January 24, 2014, Eaton again certified in accordance with the PPA that it was "Entitled to Receive Payment" from Farley for Facility environmental costs, including costs for the pump and treat groundwater remediation system, incurred from November 2010 through December 2013 in the amount of $175,838.48 (the 2014 Claim), which Farley again failed to pay. On February 18, 2014, Farley's counsel timely issued a notice of dispute resolution under the PPA with respect to the 2014 Claim. Ultimately, the 2014 Claim proceeded to arbitration in Chicago, Illinois before Arbitrator Michael Pope. Farley added a new claim challenging the 2010 Claim.  Eaton filed a Counterclaim.  After a four-day hearing, the Arbitrator issued his Interim Award with

3

supporting Opinion and a Final Award following briefing which are the subject of the attempts to vacate and confirm now before the Court.

### Standard of Review

The Federal Arbitration Act (FAA) has a strong presumption in favor of confirming an arbitration award, so a court's review of an arbitrator's decision is exceedingly narrow, "one of the narrowest standards of judicial review in all of American jurisprudence." *UHL v. Komatsu Forklift Co.*, 512 F.3d 294, 305 (6th Cir. 2008) (quoting *Lottimer-Stevens Co. v. United Steelworkers*, 913 F.2d 1166, 1169 (6th Cir. 1990)). "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept....[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987); *Stonebridge Equity v. China Auto. Sys., Inc.*, 520 F. App'x 331, 337 (6th Cir. 2013)(citations and internal quotations omitted).("So long as the arbitrator was even arguably construing or applying the contract, the award cannot be overturned.")  Consequently, courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. *United Paperworkers Int'l Union, AFL CIO, supra.* Under the FAA, once an arbitration award is made, any party to the arbitration may move to confirm the award. 9 U.S.C. § 9. The court "must grant the motion unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11." *Id.*  A district court may make an

order vacating the award where the arbitrators exceeded their powers. 9 U.S.C. § 10(a)(4). These two sections provide the "exclusive regime[]" for federal court review of an arbitrator's award. *Grain v. Trinity Health, Mercy Health Servs. Inc*., 551 F.3d 374, 378 (6th Cir. 2008) (quoting *Hall St. Assocs. V. Mattel, Inc*., 552 U.S. 576 (2008)).  Review of an award under Ohio law, Ohio Revised Code § 2711, is similarly narrow.

**Discussion**

Petitioner moves to vacate the Award on the basis that the Arbitrator exceeded his powers because he ignored the PPA's express limitations on Eaton's entitlement to indemnification from Farley. Respondent moves to confirm the Award because the Arbitrator properly interpreted the express language of the PPA and petitioner sets forth no valid grounds under the FAA for vacating it.

The Arbitrator's Opinion found and concluded the following. The 1986 APSA provided that petitioner's company, Condec, would indemnify respondent for all required remediation costs arising out of the preexisting lagoon contamination.[1]  In 1987, the DEP issued the clean-up order and Eaton ultimately installed the pump and treat system which became operational in 1992.  Petitioner and his companies were kept informed of the negotiations leading to the pump.  From 1991 to 2003, petitioner or his companies made 13

---

[1] The sellers agreed to indemnify Eaton for "any liabilities, obligations, fines, clean-up costs or penalties in excess of $135,000 in the aggregate resulting from non-compliance prior to Closing by Sellers with respect to any premises related to the CCC Business, with any applicable laws, regulations, orders or other requirements of governmental authorities, relating to the control of surface or groundwater pollution, hazardous substances or waste (or the disposal thereof), or air quality and emission standards, or otherwise relating to the protection of the environment."

payments to Eaton for reimbursement. There were several agreements between the parties after the APSA whereby petitioner assumed personal responsibility for the indemnification costs that respondent was incurring under the original agreement. Under the contract at issue, the 1998 PPA, petitioner assumed personal liability for the indemnification obligations "resulting from non-compliance prior to August 8, 1986 by CCC or VBQ, with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986." Petitioner argued that he is not responsible for clean-up costs at the plant because as of August 8, 1986, there existed no valid order from a governmental authority addressing the contamination.

      The Arbitrator rejected petitioner's argument and determined that the "non-compliance" pre-dating August 6, 1986 included "other requirements of any governmental authorities" and there were pre-existing DEP requirements.  In particular, the Arbitrator stated that "the record reveals several instances before the sale where the DEP had visited the site and recognized both the existence of the contamination and the need for remedial effects." Thus, in 1982, the DEP issued a Notice of Deficiency regarding solvents being dumped into the lagoon and in 1984, the DEP issued a Notice of Violation requiring soil samples to be collected because of deposit of paints and solvents in the lagoon.  Subsequent sampling by CCC's consultant revealed high levels of contamination. The various notices resulted in the 1987 clean-up order which required remedial action be taken for groundwater, surface water, and soil contaminants resulting from the lagoon. While there may not have been any governmental clean-up order in place as of August 6, 1986, the PPA's Exhibit A's inclusion of "other requirements" shows that the parties intended that something other than a specific

order or regulation would be sufficient to trigger indemnification. As stated by the Arbitrator,

> In attempting to construe the intent of the parties- all of whom were sophisticated businesses- it is hard to accept that they intended the restrictive reading of the language suggested by Farley. Why would a buyer agree to indemnification of a known polluted site only if a government order had already been issued?  And if that restrictive interpretation was intended, how to explain the contemporaneous and later conduct of the parties?

(Opinion at 6) The Arbitrator pointed to four such instances of conduct: 1) As part of the sale, Condec had to comply with a Form III certification under Connecticut law but could not do so due to the known contamination.  Instead, in a document dated August 6, 1986, it undertook in the future to "contain, remove or otherwise mitigate" the effects of the discharge or seepage of hazardous waste at the site. 2) Petitioner and his companies admitted many times that the clean-up costs at the site were covered by the indemnification obligations.  These included the 1986 sale documents, as well as October 1986, October 1998, and November 1990 similar documents.  3) The 1998 PPA and the AIG policy itself include similar admissions, and the AIG policy defined its coverage for clean-up costs to include "the current remediation at the Bethel site." 4) Petitioner or his companies began paying respondent's reimbursement requests in 1991 and made a total of 13 payments over the next 12 years. This shows that the parties understood that the money was required by the agreements to be paid and petitioner's testimony that he paid it because he "trusted" Eaton is unconvincing. AIG paid most of the 2011 reimbursement request because it was bound to do so by the terms of the policy of which Eaton was a named insured.

Accordingly, the Interim Award "found and declared":

A. Eaton's 2010 Claim and 2014 Claim costs were clean-up costs at the plant "resulting from non-compliance prior to August 8, 1986 by CCC or VBQ, with any applicable laws, regulations, orders, or other requirements of any governmental

7

>authorities existing on or before August 8, 1986, as set forth in Exhibit A of the PPA.";
>
>B. Eaton is entitled to retain the funds received under the AIG Policy for its 2010 Claim; and
>
>C. Eaton is entitled to reimbursement from Farley for its 2014 Claim in the amount of $175,838.48, plus statutory interest of $10,265.18 under Ohio Rev. Code § 1343.03(A),4 for a total of $186,103.66

The Arbitrator's Opinion also awarded reasonable attorney's fees and costs. After additional briefing thereon, the Final Award awarded $902,106.24 in attorney's fees and costs to respondent as the prevailing party.

Petitioner now seeks to vacate the Award arguing that the Arbitrator exceeded his authority because the indemnification provision of the PPA was subject to restricting conditions and the Arbitrator instead gave Eaton a blank check for the clean-up expenses. Petitioner asserts that he is not responsible for the clean-up costs at issue because prior to August 8, 1986 there were no "governmental requirements" requiring groundwater clean-up.

Petitioner points out that under Exhibit A of the PPA, respondent is not entitled to reimbursement unless the clean-up expenses were "resulting from non-compliance prior to August 8, 1986 by CCC or VBQ, with any applicable laws, regulations, orders, or other requirements of any governmental authorities existing on or before August 8, 1986." Petitioner argues that there were no governmental requirements prior to August 8, 1986 regarding groundwater clean-up at the plant. Rather, the earliest "requirement" was the 1987 DEP order which was not within Exhibit A's time restriction. On this basis, petitioner contends that the Arbitrator exceeded his powers by misconstruing the PPA and ignoring its unambiguous language. Instead, the Arbitrator substituted his own "interpretive thinking to

8

support a different and more expansive intent" than what the contract intended. (Doc. 7 at 6) And, the Arbitrator, by questioning why a buyer would agree to an indemnification of a known polluted site only if a government order had already been issued, "questioned the wisdom of the agreement from Eaton's point of view." (*Id.* at 7)

Petitioner contends that, contrary to the Arbitrator's conclusion that there were pre-existing DEP requirements, there were no applicable pre-August 8, 1986 government requirements. While the Arbitrator stated that the DEP "visited the site" before 1986, he does not point to any "government requirement" regarding the groundwater prior to the effective date. The 1982 Notice of Deficiency and 1984 Notice of Violation did not impose any groundwater clean up requirement. Petitioner asserts that the 1982 Notice did not address groundwater requirements or remediation but rather the deficiencies had to do with inspections, training, labeling, and contingency plans. Similarly, the 1984 Notice concerned removal of empty containers for disposal at a local landfill, labeling containers, and possible soil samples. In July 1987, the DEP verified that compliance with the 1984 Notice had been achieved. Thus, these notices could not have been the basis for the ongoing costs for which Eaton seeks reimbursement. Accordingly, petitioner asserts, the Arbitrator failed to interpret the PPA but eviscerated its indemnification restrictions. In doing so, the Award "departs from the essence of" the PPA which means that it must be vacated.

Respondent asserts that petitioner fails to demonstrate that the Arbitrator exceeded his powers and merely seeks to re-litigate the same arguments he unsuccessfully advanced before the Arbitrator.

For the following reasons, the Court agrees with respondent that the Award must be

9

confirmed and there is no ground to vacate.  As discussed above, "If an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision."  *Oakwood Healthcare v. Oakwood Hospital Employees,* 615 Fed.Appx. 302 (6th Cir. 2015).  In asking whether the arbitrator "arguably construed a contract," a court observes whether the opinion "had the hallmarks of interpretation such as quoting from and analyzing the pertinent provisions of the agreement."  *Id.* (internal quotations and citation omitted) And, a court asks whether the arbitrator says "anything indicating that he was doing anything other than trying to reach a good-faith interpretation of the contract." *Id.*

Here, the Arbitrator quoted the applicable language of the contract and explained why he did not accept petitioner's argument as to why the provision did not require his reimbursement. Thus, the Arbitrator did not "ignore" the PPA.  While petitioner argues that the Arbitrator ignored the PPA's express restrictions, he also asserts that the Arbitrator should not have interpreted the contract restrictions and improperly searched for the parties' intent. But, the Arbitrator was only referring to the intent reflected in the PPA contract language: "While Farley's argument that there must be a governmental order directing clean up in place as of August 6, 1986, is intellectually honest, the language of Exhibit A does not require that conclusion."  (Opinion at 6) Thus, based on the PPA's language, the Arbitrator determined that the parties intended "that something other than a specific order or regulation would be sufficient." *Id.* While the Arbitrator rejected  petitioner's "restrictive reading" of the PPA, he did not ignore the contract's language in doing so.  Rather, he construed the PPA's language and concluded that petitioner's reading made no sense in light of the parties' actions. Because

10

the Arbitrator's contract interpretation is entitled to such great deference, petitioner fails to demonstrate that he exceeded his powers in order to justify vacating the Award under the FAA or Ohio law.

Petitioner argues that there were no pre-1986 groundwater remediation requirements. Respondent counters that this issue was actually litigated before the Arbitrator who disagreed and found that there were pre-existing DEP requirements. As this Court has previously recognized, a party may not merely re-litigate issues resolved in arbitration under the guise of a motion to vacate. *Willacy v. Marotta,* 2016 WL 278796 (N.D. Ohio Jan. 22, 2016) (Plaintiff's "current motion is simply a disguised effort to revive the arguments he raised before the arbitrator.")  Moreover, respondent points out that petitioner's attempt to re-litigate the merits here is contrary to the PPA wherein the parties agreed to resolve the dispute through arbitration. Furthermore, as noted by the Arbitrator, pre-hearing briefs were submitted, the hearing lasted four days, seven witnesses testified, hundreds of exhibits were admitted into evidence, and comprehensive briefs were submitted following the hearing. Respondent summarizes the evidence presented at the arbitration hearing of the groundwater remediation standards in effect in 1986.  The Arbitrator's rejection of petitioner's argument that there were no applicable groundwater requirements will not be disturbed.

### **Conclusion**

For the foregoing reasons, petitioner's Motion to Vacate Arbitration Award is denied and respondent's Motion for Confirmation of Arbitration Award and Entry of Final Judgment Thereon is granted.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 7/6/16